**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John David O'CONNER, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**George Alberto MONREAL,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Medardo Edward LUGO, Defendant–**
**Appellant.**

**Nos. 94–3567, 94–3869 and 94–3568.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 13, 1995.

Decided Aug. 23, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 16, 1995.

Dean Stowers, Des Moines, IA, argued, for John O'Conner.

Frank Steinbach, III, Des Moines, IA, argued, for George Monreal.

Patricia Mullen Hulting, Des Moines, IA, argued, for Medardo Lugo.

Robert Dopf, Asst. U.S. Atty., Des Moines, IA, argued, for U.S.

Before McMILLIAN, Circuit Judge, LAY, Senior Circuit Judge, and LOKEN, Circuit Judge.

PER CURIAM.

George Alberto Monreal, Medardo Edward Lugo, and John David O'Conner appeal their convictions for cocaine distribution in the Southern District of Iowa. All three defendants were convicted of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. Lugo and O'Conner were also convicted of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). O'Conner was convicted of one distribution count for involvement in a transaction occurring on or about April 1, 1992. Lugo was convicted of two distribution counts for deliveries of cocaine to the Quad Cities area on or about August 1, 1992 and August 8, 1992. For the reasons outlined below, we reverse and remand for a new trial all charges against O'Conner, and the two distribution charges against Lugo.[1] In all other respects, we affirm.

## BACKGROUND

Monreal, Lugo, and O'Conner were convicted for their involvement in a cocaine distribution conspiracy. Testimony at trial established that Alex Lona distributed large amounts of cocaine to the Quad Cities area with the aid of numerous coconspirators, including his brother, Richard Lona. According to Alex Lona, almost all of the cocaine was delivered to Adrian Rogers for resale in the Quad Cities area.[2] Several coconspira-

---

1. O'Conner received a 121–month sentence for his convictions on both the conspiracy count and the distribution count. Lugo received a 168–month sentence for the conspiracy count, and a 120–month sentence for the distribution counts, the latter sentence to run concurrently with the former. Thus, according to the sentencing record, the reversal of Lugo's convictions on the distribution counts does not affect his 168–month sentence.

2. Adrian Rogers was tried and convicted separately from these defendants two months after their trial.

tors, including the Lonas, pled guilty and testified against Monreal, Lugo, and O'Conner at their joint trial.

The Government produced evidence that Monreal supplied Alex Lona with cocaine to deliver to the Quad Cities area during 1992 and 1993. Testimony established that Lugo supplied Alex Lona with cocaine, and also travelled to the Quad Cities area to make deliveries. Alex Lona testified that O'Conner introduced him to Adrian Rogers and acted as a middleman in several sales to him, as well as in two sales to an unidentified white farmer in the Quad Cities area.

After the trial, Isaac Ricabal, one of the coconspirators who had testified against Monreal, Lugo, and O'Conner, wrote a letter to the district court judge claiming he had testified falsely. He claimed to have done so because the Lonas were threatening him and his family, and also because the Government had influenced him to testify in a certain manner. The district court held a hearing on the matter and found Ricabal's recanted testimony was not credible, and that his trial testimony had been truthful. The court found the Government did not try to influence Ricabal's testimony. The court also found, however, that Ricabal had reported to the Government that the Lonas had threatened him and tried to influence his testimony at trial, and that the Government never disclosed these alleged threats to defense counsel. Nevertheless, the district court concluded that the disclosure of the threats would not have changed the outcome of the trial. On that basis, the court denied the defendants' motion for a new trial.

Monreal, Lugo, and O'Conner appeal the denial of their motion for a new trial. In addition, Monreal appeals the district court's denial of his motion to dismiss the indictment based on an alleged violation of the Double Jeopardy Clause of the Fifth Amendment. O'Conner claims the district court violated his Sixth Amendment right to counsel of his choice by granting the Government a contin-

uance. He also claims the evidence was insufficient to support his conviction.

## ANALYSIS

### I.

The district court found that Ricabal had reported to agents of the Government that he was threatened by the Lonas, but the Government failed to disclose these threats.[3] Michael Galvin, Lugo's former attorney, testified at the hearing on the defendants' motion for a new trial. He testified that Ricabal told him that Richard Lona had threatened him by stating that Alex Lona, who was not yet in custody, would harm Ricabal's family if Ricabal told the Government what he knew. At that time, Richard Lona and Ricabal were inmates together in the same cell block. Galvin further testified that these threats were reported to Drug Enforcement Administration Agent Ken Franson. Franson corroborated that testimony. Galvin also testified that after Ricabal decided to cooperate with the Government, when Richard Lona had not yet decided to cooperate, Ricabal reported to Assistant United States Attorney Lester Paff that the Lonas were threatening him. Galvin stated that Ricabal reiterated his concerns about the threats to Paff at Ricabal's sentencing hearing.

Furthermore, and more importantly, Franson testified that Ricabal told him during the defendants' trial that the Lonas were trying to influence his testimony. Franson testified as follows:

> [Ricabal] stated that Alex had told him that—certain things he wanted him to say, so I asked [Ricabal], I said, "Is what you're telling the truth?" And he says, "Yes. I was told to tell the truth." I said, "Don't listen to him. Don't worry about it, and tell the truth."

Appellant's Appendix at 234–b (Transcript of the Hearing on the Motion for a New Trial at 97). These reports of threats and attempts by Alex Lona to influence Ricabal's trial

---

3. The defendants rely heavily on Ricabal's claims that the Government improperly influenced his testimony. The district court found that these claims, as well as Ricabal's recanted testimony, were not credible. We accept the district court's credibility assessment on these points, and consider only whether the fact that the Government failed to disclose certain evidence to defense counsel requires reversal.

testimony were not disclosed to defense counsel.

In addition, when two other coconspirators, Melissa Franzen and Greg Hall, were debriefed by the Government after their arrest in February 1993, they both stated that the Lona brothers and Ricabal were getting their "stories straight." The interview reports of the debriefings contained these statements, but they were not disclosed to defense counsel. Monreal, Lugo, and O'Conner urge that both the threats and the interview reports were material evidence that they could have used to impeach the Lonas' and Ricabal's testimony. They request a new trial based on the Government's failure to disclose this information.

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the Supreme Court held the Government's failure to disclose evidence that is both favorable to the accused and material to guilt or punishment violates due process. Evidence impeaching the credibility of a government witness, as well as exculpatory evidence, falls under the *Brady* doctrine. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). In this case, the interview reports, threats, and attempts to influence Ricabal's trial testimo-

ny, were all evidence defense counsel could have used to impeach the credibility of the Lona brothers, as well as Ricabal. In *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), the Court found that the failure to disclose *Brady* material requires reversal only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The Court noted that "[a] 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

Because the evidence presented against each defendant on each charge was different, we must consider each charge against each defendant separately to determine whether there is a reasonable probability this impeachment evidence, in its totality, would have affected the jury's verdict on that charge.[4] We have carefully examined the record and find that as to the conspiracy charges against Monreal and Lugo, there is no reasonable probability the outcome of the trial would have been different if this additional impeachment material had been disclosed. Other substantial evidence corroborated the Lonas' and Ricabal's testimony and linked Monreal[5] and Lugo[6] to the conspiracy.

4. The impeachment evidence that was not disclosed includes Franzen and Hall's interview reports, the early threats made by the Lonas, as well as any attempt to influence Ricabal's trial testimony during the defendants' trial. We note, however, that if we were considering only the nondisclosure of the interview reports and the early threats made against Ricabal before the Lonas agreed to cooperate with the Government, we would have little difficulty concluding that their disclosure would not have affected the outcome of this trial. That material is not particularly strong impeachment evidence against the Lonas or Ricabal because it all occurred either before both the Lonas and Ricabal had decided to cooperate with the government, or when Ricabal was cooperating but Richard Lona was not. We are far more troubled by Ricabal's claim, corroborated by Agent Franson, that the Lonas were trying to influence his trial testimony during the trial. That is much stronger impeachment evidence. If the Lonas were telling the truth at trial, there would be little reason for them to try to influence Ricabal's testimony.

5. Alex Lona, Richard Lona, and Isaac Ricabal all testified that Monreal supplied cocaine that was

ultimately distributed in Iowa. In addition, a DEA agent from California testified that he had tape recorded conversations between Monreal and Daniel Gutierrez, a known cocaine dealer. In those conversations, Monreal discussed purchasing cocaine from Gutierrez. Based on those tape recorded conversations, Monreal pled guilty to use of a telephone in connection with a drug transaction in California. Raymond Gonzalez testified that Monreal supplied Alex Lona with cocaine to distribute in Iowa. Thus, the Lonas' and Ricabal's testimony against Monreal was corroborated by other evidence.

6. The evidence presented against Lugo included the testimony of both the Lona brothers that Lugo helped them procure cocaine and also flew to the Quad Cities area to help deliver the cocaine. Ricabal testified that Lugo accompanied him on a trip to Iowa to deliver a bag to Richard Lona. (Ricabal stated that he never saw what was in the bag.) Gonzalez testified that Lugo supplied him with cocaine, and then introduced him to another supplier named Fausto Felix from whom Gonzalez then purchased cocaine. Gonzalez also testified that Lugo supplied Lona with some of the cocaine that he delivered to Iowa.

■ The charges against O'Conner present a more difficult problem, because the Lonas' testimony provided the Government's only evidence on those charges.[7] *See Reutter v. Solem,* 888 F.2d 578, 581 (8th Cir.1989) (finding reversal necessary under *Bagley* standard where impeachment evidence was not disclosed and "the state's case against [the defendant] depended almost entirely on [the witness's] testimony"). Moreover, during closing arguments, O'Conner's counsel pointed out that both Richard and Alex Lona stated during initial debriefings by the Government that Alex Lona met Adrian Rogers as early as 1989 or 1991 in Arizona. O'Conner's counsel also noted that Alex Lona had testified before the grand jury that he did not meet O'Conner until April 1992. From this evidence, O'Conner's attorney was obviously trying to create the impression that Alex Lona had actually been dealing with Adrian Rogers before Lona ever met O'Conner and that the Lonas colluded on a story to implicate O'Conner. If O'Conner's counsel had known about the Lonas' alleged attempt to influence Ricabal's testimony during trial, he could have used that information to buttress that theory of the case.[8]

Alex and Richard Lona also provided the only testimony linking Lugo to the substantive distribution charges for which he was convicted. The Lonas and Ricabal provided the only evidence that Lugo travelled to Iowa twice in August 1992 to distribute cocaine. That testimony was corroborated by hotel receipts bearing Lugo's signature at a hotel in the Quad Cities area. Lugo took the stand and admitted to travelling to Iowa, but claimed he was along as a favor to Alex Lona and did not know about the drug transactions. Because there are receipts that corroborate the Lonas' testimony on this point, Lugo's case presents a closer question than that of O'Conner. Nevertheless, with respect to the two substantive distribution counts, we find that there is a reasonable probability that if Lugo's counsel had had access to the additional impeachment evidence, it would have made a difference on those charges.

It is true that defense counsel had access to other impeachment evidence against the Lonas and Ricabal. Each of these witnesses was seeking a substantial-assistance motion from the Government to reduce his sentence, and the Lonas had not yet been sentenced at the time of trial. Moreover, there were inconsistencies in the witnesses' stories. Nevertheless, the fact that other impeachment evidence was available to defense counsel does not render additional impeachment evidence immaterial. *See Napue v. Illinois,* 360 U.S. 264, 270, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *Reutter,* 888 F.2d at 581. We find that the early threats the Lonas made to Ricabal, combined with the undisclosed statements from the interview reports on Hall and Franzen, and particularly the attempt to influence Ricabal's testimony during trial, could have tipped the balance and caused the jury to disbelieve the Lonas and Ricabal, who provided the only evidence against O'Conner

Dave Makshanoff testified that Lugo helped Alex Lona purchase cocaine from Fausto Felix for distribution in Iowa. Thus, again, even without the testimony of the Lonas and Ricabal, there was sufficient evidence to link Lugo to the conspiracy to distribute cocaine in the Quad Cities area.

7. The Lona brothers provided the sole evidence of O'Conner's involvement in the conspiracy. Alex Lona testified that O'Conner first introduced him to Adrian Rogers while O'Conner was in Mesa, Arizona attending a community college. He also testified that O'Conner then acted as a middleman between Lona and Rogers, for a fee, for several months, after which time Lona dealt with Rogers directly. Alex Lona claimed he had delivered cocaine to O'Conner and an identified white farmer in the Quad Cities area on at least one occasion. Richard Lona testified that on another occasion he delivered cocaine to O'Conner and the same unidentified white farmer. Ricabal was also present at that transaction, but was unable to identify O'Conner at trial.

8. O'Conner's attorney points out that, at the defendants' hearing on their motion for a new trial, Ricabal claimed one of the matters on which the Lonas were attempting to influence his testimony related to O'Conner. Ricabal stated that Richard Lona told him to testify that O'Conner was present at a certain drug transaction that, according to Richard Lona's testimony at trial, had occurred between Richard Lona, Ricabal, O'Conner, and an unidentified white farmer. Ricabal claimed at the hearing on the defendants' motion for a new trial that O'Conner was not present at that transaction. This is a portion of Ricabal's recanted testimony, however, and the district court found that recanted testimony untruthful.

and the only evidence against Lugo on the substantive distribution counts.

The Government stressed throughout trial that the Lonas and Ricabal would not lie because if they were caught in a lie, they would lose the benefit of their plea bargains. Evidence of the Lonas' attempts to influence another witness's testimony *during the trial,* casts doubt on the Government's claim that they would not give untruthful testimony once they had entered into plea agreements and agreed to cooperate with the Government.[9] Thus, we reverse and remand for a new trial on the conspiracy and distribution charges against O'Conner and on the substantive distribution counts with which Lugo was charged.[10] We affirm Lugo's conviction on the conspiracy count.

## II.

Monreal claims that his conviction should be overturned because he was placed in jeopardy for the same conduct in California. The record reflects that on March 9, 1993, in California, Monreal was indicted for a drug conspiracy involving some of the same individuals involved in the conspiracy with which he was charged in this case. He entered a plea agreement on August 26, 1993, under the terms of which he pled guilty to the intentional use of a telephone in a drug transaction. The conspiracy charge was then dismissed. In January 1994, Monreal was indicted in federal court in the Southern District of Iowa for what he claims is the same conspiracy for which he was indicted in California. Monreal claims that because he was indicted for a conspiracy involving some of the same participants during the same time frame in California, he cannot be convicted for that conspiracy in federal court in Iowa, even though the California conspiracy charges was ultimately dismissed. In the alternative, he claims the Government should be collaterally estopped from prosecuting him. We find no merit to these contentions.

 There can be no double-jeopardy violation unless jeopardy has attached during a prior prosecution. *See Serfass v. United States,* 420 U.S. 377, 391, 95 S.Ct. 1055, 1064, 43 L.Ed.2d 265 (1975). "Jeopardy attaches to a prosecution when the jury is empaneled and sworn or, in a nonjury case, when the court begins to hear evidence." *United States v. Bailey,* 34 F.3d 683, 687 (8th Cir. 1994); *see also United States v. Miller,* 23 F.3d 194, 198 (8th Cir.) ("[J]eopardy does not attach until the jury is empaneled and sworn."), *cert. denied,* —— U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 137 (1994). Because the California conspiracy charges were dismissed, jeopardy never attached in the prior state proceeding on those charges.

 Monreal's collateral-estoppel argument fails for the same reason. The doctrine of collateral estoppel prevents the government from relitigating an issue "when an issue of ultimate fact has once been determined by a valid and final judgment." *United States v. Baugus,* 761 F.2d 506, 508 (8th Cir.1985) (quoting *Ashe v. Swenson,* 397 U.S.

9. The Government also argues that the disclosure of the threats would not have affected the outcome at trial because that information was available to the attorney of Adrian Rogers, who was tried after these defendants for his involvement in the same conspiracy. Rogers was convicted. The Government relies on our decision in *United States v. Montoya,* 952 F.2d 226, 227 n. 2 (8th Cir.1991), in urging that we may consider this fact in determining whether the additional impeachment evidence would have affected the outcome at trial. The fact that Rogers had access to this material does not persuade us that the material would not have affected the outcome of the defendants' trial in the present case. There were numerous witnesses who testified against Rogers and corroborated the Lonas' testimony against him. Thus, Rogers' situation is different because he was not convicted on the Lonas' testimony alone.

10. Because we have granted O'Conner a new trial based on the Government's failure to disclose the impeachment material, we need not address O'Conner's claim that the district court abused its discretion in granting the Government a continuance. O'Conner also urges on appeal that there was insufficient evidence to support his conviction. We have reviewed the record and conclude that if the Lonas' testimony is believed by the jury, there is sufficient evidence to convict O'Conner. Alex Lona testified that O'Conner was present and facilitated several drug transactions with Adrian Rogers beginning in April 1992. Richard Lona testified that O'Conner facilitated a transaction with an unidentified white farmer in the summer of 1992.

436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)). Monreal's participation in the conspiracy was not determined in the California proceeding. Thus, the Government was not barred from litigating that issue in this case.

### III.

For the foregoing reasons, we reverse and remand for retrial all charges against O'Conner, and the two substantive distribution charges against Lugo. In all other respects, the judgment of the district court is affirmed.